**ROBERTSON & ASSOCIATES, LLP**
Alexander Robertson, IV (CA SBN 127042)
  *arobertson@arobertsonlaw.com*
Mark J. Uyeno (CA SBN 189063)
  *muyeno@arobertsonlaw.com*
32121 Lindero Canyon Road, Suite 200
Westlake Village, California 91361
Telephone (818) 851-3850 • Facsimile (818) 851-3851

**WHITFIELD BRYSON & MASON**
Daniel K. Bryson (*Pro Hac Vice* pending)
  *dan@wbmllp.com*
Patrick M. Wallace (*Pro Hac Vice* pending)
  *pat@wbmllp.com*
900 W. Morgan Street
Raleigh, North Carolina 27609
Telephone (919) 600-5000 • Facsimile (919) 600-5035

**AHDOOT & WOLFSON, PC**
Robert Ahdoot (CA SBN 172098)
  *rahdoot@ahdootwolfson.com*
Tina Wolfson (CA SBN 174806)
  *twolfson@ahdootwolfson.com*
1016 Palm Avenue
West Hollywood, California 90069
Telephone (310) 474-9111 • Facsimile (310) 474-8585

Attorneys for Plaintiff And The Proposed Class

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOREEN MASTERS, an individual, on behalf of herself and all others similarly situated,<br><br>              Plaintiff,<br><br>      vs.<br><br>LUMBER LIQUIDATORS, INC., a Delaware corporation,<br><br>              Defendant. | Case No. 2:16-cv-6577<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

/ / /

/ / /

/ / /

1    Plaintiff Doreen Masters ("Plaintiff"), individually and on behalf of all other
2    persons similarly situated, by her undersigned attorneys, alleges the following based
3    upon personal knowledge as to herself and her own acts, and upon information and
4    belief as to all other matters based upon the investigation conducted by and through
5    her counsel, which includes, among other things, review and analysis of Lumber
6    Liquidators Holdings, Inc.'s public documents, Securities and Exchange
7    Commission ("SEC") filings, web sites, announcements, analysts' reports and
8    investigative journalist reports. Plaintiff believes that substantial evidentiary support
9    will exists for the allegations set forth herein after reasonable opportunity for
10   discovery.

11                                **INTRODUCTION**

12    1.    This is a breach of warranty, fraudulent omission/concealment, and
13   federal and state statutory class action on behalf of a class consisting of all persons
14   who reside in United States who purchased from Lumber Liquidators, Inc.
15   ("Lumber Liquidators," "the Company," or "Defendant") laminate flooring products
16   manufactured in China under the private-label "Dream Home" brand (the
17   "Laminates") concerning Plaintiff's Third Cause of Action, or alternatively on
18   behalf of a class of all persons who reside in Alabama for all claims for relief,
19   seeking to recover damages caused by the Company's failure to deliver durable
20   flooring that complied with the specified industry standard contained in the product
21   description. These products are not durable as represented, and are not merchantable
22   for general household use because they do not meet the claimed industry standard.
23   Lumber Liquidators' failure to disclose that the Laminates were substandard and
24   defective caused Plaintiff and the proposed class to overpay for the subject flooring.

25    2.    Lumber Liquidators is one of the largest specialty retailers of hardwood
26   flooring and laminates in the United States. The Company sells directly to
27   homeowners or to contractors acting on behalf of homeowners through its network

28

1   of approximately 300 retail stores in 46 states, including Alabama.

2   **GENERALIZED FACTUAL ALLEGATIONS**

3   3.      Prior to Plaintiff's purchase Lumber Liquidators extensively advertised

4   and marketed the Laminates as compliant with an established European abrasion

5   criteria or class, "AC3," the primary industry standard for durability of laminate

6   flooring. However, the Laminates are not AC3-compliant or durable.

7   4.      An AC3-rated laminate is considered in the industry as suitable for

8   general household use, including high traffic areas such as hallways and kitchens.

9   5.      Lumber Liquidators, on its website, describes the suitability of AC3-

10  rated laminates as "Residential, Heavy Traffic: Suitable for all areas."

11  6.      In the United States, laminates with less than an AC3 rating are not

12  considered suitable for general household use.

13  7.      Plaintiff sought, was informed and led to believe that she was buying,

14  and intended to buy, laminate flooring suitable for general household use.

15  8.      The "Dream Home" brand is a private-label brand owned, marketed,

16  and sold exclusively by Lumber Liquidators. The Dream Home brand includes the

17  St. James, Ispiri, Kensington Manor, and Nirvana flooring lines.

18  9.      From time to time Lumber Liquidators has sourced laminates under the

19  "Dream Home" brand from plants located in different countries, including the

20  United States. The Laminates that are the subject to this action are limited to

21  Lumber Liquidators' Chinese-manufactured laminates.

22  10.     Plaintiff and putative Class Members purchased the Laminates through

23  one of Lumber Liquidators' company-owned retail outlets, based upon express oral

24  representations of the Laminates' durability, made by Lumber Liquidators sales staff

25  that the Laminates were "very durable," "extremely durable," "scratch resistant,"

26  "harder than hardwood," "great for pets," "pet proof," could withstand "high traffic

27  in a residential home," and had a "30 year warranty."

28  11.     Plaintiff and many putative Class Members had, before purchase of the

Laminates, specific concerns regarding the susceptibility of laminate flooring to scratching from normal residential use or from the claws of their pets.  Lumber Liquidators told them that they had nothing to worry about: that the Laminates would stand up to pets, as attested to in a video posted on its website focused on this very concern.

12.     Lumber Liquidators has promoted the Laminates through its in-store management and sales staff, who are trained based on—and are encouraged to consult and repeat—the product specifications, features, and supposed "advantages" described on product pages for each of the Laminates on the Lumber Liquidators web site.  Each of the individual Laminates' product pages describe the Laminate as meeting the industry AC3 standard.

13.     The AC3 standard that Lumber Liquidators claims that its Laminates adhere to is the primary basis upon which:

a. Its in-store sales staff represents that the Laminates are "durable," "very durable," "extremely durable," "scratch resistant," and "harder than hardwood";

b. Its Laminates "landing page" on its website (from which the consumer can select model-specific web pages containing detailed descriptions of each model) have represented that the Laminates are each "very durable" and "very scratch resistant"; and

c. Lumber Liquidators claims, in its Limited Warranties, that the Laminates each meet the "industry's highest standards."

14.     Despite Defendant's pervasive representations, the Laminates are not AC3 compliant and not durable, as revealed by extensive recent product testing as part of the investigation leading to this action.

15.     The failure of the Laminates to meet the industry AC3 standard as claimed leads to a host of problems for consumers and Plaintiff as set forth below, including but not limited to:

    a.  Visible and unsightly scratching in normal everyday use, including but not limited to pet traffic;

    b.  Wear patterns that expose and deteriorate the photographic paper layer of the laminate that is supposed to be protected by the wear layer for twenty-five to thirty years;

    c.  Chipping;

    d.  Fading;

    e.  Warping; and

    f.  Staining.

**The Laminates Are Substantially Similar Products**

16.    Laminate flooring is considered in the industry and by financial analysts as a commodity product, in the sense that its construction is relatively uniform across brands and models, with each seller competing largely on the basis of price.

17.    As set forth in greater detail below, the Laminates comprise a single product, which are substantially similar in every way material to the claims presented herein. The differences among each model of the Laminates are primarily cosmetic—designed to meet varying interior decoration preferences of consumers (including color, style of wood grain image, board width, etc.).

18.    Typically, laminate flooring sold at retail for residential use is constructed using four basic layers:

    a.  The bottom backing layer (balancing layer) to create a stable and level support for the rest of the plank;

    b.  On top of the backing layer is a medium density or high density fiberboard core, which are frequently referred to in the industry interchangeably as MDF or HDF cores;

    c.  On top of the core is a decorative layer (photograph paper) of wood grain or other pattern; and

1    d.  The transparent top layer of a melamine resin, the wear layer, provides
2         protection against wear, scratching, staining, and fading.

3    19.  The laminate floor is created when the four layers are pressed together
4  under pressure and heat. The sheets are then cut into individual planks and
5  frequently have tongue and groove edges cut into them.[1]

6    20.  An image found on Lumber Liquidators' website confirms that the
7  Laminates are substantially similar:



21  This image was created by Lumber Liquidators to advance its position that its
22  Chinese-manufactured laminates (the same products as the Laminates) do not
23  violate California Air Resources Board regulations for formaldehyde. The fact that
24  the Company is able to describe the construction and manufacturing process for

26  ———————————————
27    [1] Laminate flooring is frequently installed on underlayment material to
   improve sound or moisture performance, and occasionally such underlayment is pre-
28  glued to the backing layer for convenience.

1 each of the Laminates in a single image demonstrates that the Laminates are
2 substantially similar products.

3     21.    The Laminates are distinguished primarily by aesthetic considerations
4 having to do with the color and wood grain depiction of the decorative layer, the
5 gloss, the width of the boards, and other variables (including thickness) which do
6 not materially affect the durability of the various Laminates.

7 **"Durability" And Similar Descriptions Are Based On The AC3 Rating**

8     22.    Whether or not a laminate meets the AC3 standard is dependent upon
9 the thickness, uniformity, and composition of the top wear layer.

10     23.    In the residential laminate flooring industry, AC rating is closely
11 associated with "durability."

12     24.    An example is Pergo. Pergo is the most prominent brand of laminate
13 flooring sold in the United States. On its website, www.pergo.com, under the tab
14 "Information & Help" and the pick list "FAQs" for the question "How is Pergo
15 laminate flooring constructed?" is explained:

16     The first component is our patented ScratchGuard Advanced
17 surface protection, which is comprised of a melamine resin enriched with aluminum oxide particles for enhanced scratch and scuff protection. In our most premium performance floors, ScratchGuard
18 Advanced is combined with our innovative PermaMax™ wear layer to create a highly durable and wear-resistant surface that provides twice
19 the wear and twice the durability* versus ordinary laminates.

20 The asterisk next to "durability" in the above quote references the following
21 note:

22     "*Wear Claim compared to standard AC-3 laminate flooring and
23 measured in accordance with NALFA/ANSI LF-01 2011 and/or EN 13329:2006+A1:2008."[2]

24     25.    The term "durable" when used in the retail residential laminate flooring
25 industry is a reference to—and evaluated by—the relative AC rating of the laminate
26 flooring product.

27 _____

28     [2] https://na.pergo.com/Care_Maintenance/faq (visited March 1, 2016).

26.   "Durable" when used in the retail residential wood laminate flooring industry means an AC rating of at least AC3.

27.   The term "premium" when used in the retail residential laminate flooring industry is a reference to—and evaluated by—the relative AC rating of the laminate flooring product.

28.   "Premium" as used in this industry means an AC rating of at least AC3.

29.   Lumber Liquidators itself equates its laminates' AC rating with their durability. On a webpage published by Defendant on its website no later than May 7, 2013, at http://www.lumberliquidators.com/blog/whats-an-ac-rating, Lumber Liquidators states (emphasis added):

> Considering some new laminate thanks to your coupon? You may think the thicker the laminate the better, and the longer the warranty the longer it will last!  That isn't always the case, though.  **So how do you know which laminate will last in your home** (or commercial space)?  Luckily, **the European Producers of Laminate Flooring (EPLF) developed the Abrasion Rating System to give us a way of determining durability** and recommended usage level of different laminate floors.  **The common term used to denote the durability of laminate flooring is the Abrasion Criteria or "AC" rating.**
>
> **So, what exactly do AC ratings tell us?  They represent a laminate's resistance to abrasion, impact, stains and cigarette burns. AC ratings also indicate that the product has been tested for the effects of furniture legs, castors, and swelling along its edges.** When a laminate flooring product has a rating, then it has passed all of the test criteria. Failing just one test will disqualify a product.
>
> The AC rating levels are designated AC1 through AC5, **each reflecting the product's application and durability**.
>
> • • •
>
> **An AC3 for residential use is perfectly adequate. Typically the higher the laminate flooring rating, the higher the price may be.**

30.   Accordingly, when sellers of residential laminate flooring in the United States refer to a laminate product as "durable," "very durable," "scratch resistant," "harder than hardwood," or "premium," such representation constitutes a representation that the subject laminate meets at least the AC3 durability standard.

31.     Additionally, when Lumber Liquidators made express representations regarding the durability, scratch resistance and premium quality of the Laminates on its website, and when it trained its retail store managers and sales staff to describe the Laminates to shoppers as "durable," "very durable," "scratch resistant," "would not scratch," "would not scratch from pet nails," "harder than hardwood," "just as durable as hardwood," and like representations, it did so based upon its claim that the product met the AC3 industry standard for durability, including wear resistance.

**General Residential Laminate Flooring Must Be AC3 Or Better to Be Merchantable**

32.     Lumber Liquidators' primary competition in the residential flooring market, and in particular the market for laminate flooring, have for many years been the "big box" stores Lowe's and Home Depot.

33.     Lowe's and Home Depot, as well as smaller independent flooring retailers, sell non-private-label laminate flooring in addition to any private-label laminate that they sell. The following branded laminate flooring manufacturers each specify a minimum rating of AC3 for the U.S. market: Pergo, Bruce Laminate, Armstrong Laminate, QuickStep Laminate, and Alloc Laminate.

34.     Major retail sellers of residential laminate flooring in the United States—including Lumber Liquidators, Lowe's, and Home Depot—have settled on AC3 as the suitable minimum product standard in terms of durability for general use residential flooring.

35.     Lowe's does not offer any laminate flooring with a durability rating less than AC3 on its website or in its stores.

36.     Home Depot's website offers some 291 laminate flooring models in its "residential" or "commercial-residential" lines, all of which have a rating of AC3 or higher. Home Depot's website offers no laminate flooring with a durability rating

1   under AC3.[3]

2   37.   In the market for laminate flooring in the United States, in order for

3   laminate residential flooring to pass without objection in the trade for general

4   residential use (including hallways and kitchens), a laminate must meet at least the

5   AC3 durability standard.

6   **Lumber Liquidators' Responsibility for Marketing Defective Laminates**

7   38.   In January 2011, Lumber Liquidators, whose stock is publically traded,

8   under the direction of founder, Thomas D. Sullivan, hired Robert M. Lynch as

9   President and Chief Executive Officer. Lynch brought with him to Lumber

10  Liquidators William K. Schlegel as the new Chief Merchandising Officer for the

11  Company.

12  39.   Between February 22, 2012, and February 27, 2015, these officers and

13  Chief Financial Officer Daniel Terrell reported record gross margins which were

14  significantly higher than its major competitors (Home Depot and Lowe's). Through

15  these officers Lumber Liquidators misrepresented that the major driver of its high

16  margins were legitimate "sourcing initiatives" implemented by the company in

17  China designed to reduce the cost of goods, cut out middlemen, increase control by

18  the company, and strengthen relationships with its suppliers.

19  40.   Sullivan, Lynch, Schlegel, and Terrell are individual defendants in a

20  nationwide class action alleging that each of them and the company committed

21  securities fraud in violation, *inter alia,* of Section 10(b) of the Securities Exchange

22  Act of 1934, 15 U.S. Code § 78j, and SEC Rule 10b-5 promulgated thereunder. *In re*

23  *Lumber Liquidators Holdings, Inc. Securities Litigation*, Case No. 4:13-cv-00157-

24

25        [3] http://www.homedepot.com/b/Flooring-Laminate-Flooring-Laminate-
26  Wood-Flooring/N-5yc1vZbejk (visited March 1, 2016). In addition to these 291
    laminates, Home Depot's website lists three Shaw products that are shown as having
27  an AC2 rating. However none of these models is actually available for purchase
    online or in any identifiable store, and Home Depot's customer care department
28  confirms that they are no longer available and have been discontinued.

(E.D. Va.). An element of a Section 10(b) securities fraud action is "scienter," defined as having either an intent to deceive or having been reckless in the making of false or misleading representations, or with respect to an omission of material fact.

41.     Lynch and Schlegel had extensive prior experience in sourcing products from Chinese manufacturing plants prior to joining Lumber Liquidators.

42.     Among flooring retailers, laminates fill a product niche as a relatively inexpensive alternative to real (natural) solid wood flooring, generally offering the look of wood at a lower price point. This is the niche that Lumber Liquidators' Dream Home private-label brand of laminates filled at the company.

43.     For many years, laminates and solid wood flooring have constituted the most significant product ranges for Lumber Liquidators in terms of sales.

44.     Soon after they joined Lumber Liquidators, Lynch and Schlegel engaged in a so-called "sourcing initiative" regarding Lumber Liquidators' regarding the Laminates. As part of this initiative, they travelled to China and conducted "line reviews," consisting of requiring competing Chinese laminate mills to re-bid for Lumber Liquidators' laminate business.

45.     Lumber Liquidators obtained steep discounts from the Chinese mills that manufactured the Laminates. After receiving these discounts, Lumber Liquidators continued to represent to its customers that the Laminates complied with all regulatory and applicable industry standards, including notably the standards for formaldehyde emissions established by the California Air Resources Board ("CARB 2") and the European AC3 durability standard.  Lumber Liquidators was selling substandard laminates as premium products, thereby inflating its margins.

46.     Based on Lynch's and Schlegel's prior experience in sourcing products from China and on widespread industry knowledge by American companies sourcing products there, Lumber Liquidators knew, or recklessly disregarded, that negotiating steep price discounts with Chinese manufactures ran a high risk of such

1 manufacturers cutting corners to reduce manufacturing costs in order to maintain
2 margin or profits, regardless of the technical requirements of Lumber Liquidators'
3 supply contracts and product specifications.

4      47.    In March 2015, the CBS News program "60 Minutes" broadcast the
5 findings of its extensive investigation, which included hidden on camera interviews
6 of several plant managers at Lumber Liquidators' Chinese suppliers, revealing that
7 30 out of the 31 boxes of Laminates purchased in the United States by CBS did not
8 comply with the CARB 2 standard as represented on Lumber Liquidators' website
9 and on its Dream Home product labels.

10      48.    In an on-camera interview broadcast by CBS 60 Minutes, a plant
11 manager of one of Lumber Liquidators Laminates suppliers, referring to a package
12 of Lumber Liquidators' Dream Home laminate flooring on the plant floor, admitted
13 that the product was not CARB 2 compliant.  He further stated that the plant was
14 capable of manufacturing CARB 2 laminate, but that it would be more expensive to
15 do so.

16      49.    On May 7, 2015, Lumber Liquidators discontinued all sales of Chinese-
17 sourced laminates, when it had approximately $20 million inventory of this product
18 on hand.

19      50.    On December 21, 2015, Judge Arenda L. Wright Allen of the United
20 States District Court for the Eastern District of Virginia entered a ruling denying
21 Lumber Liquidators', Sullivan's, Lynch's, and Schlegel's motions to dismiss the
22 security fraud claims, finding that the allegations met the heightened pleading
23 standards for scienter set forth in the Private Securities Litigation Reform Act of
24 1995.  The court did so in part based upon the allegations in the Consolidated
25 Amended Compliant for violation of the Federal Securities Laws in the above-
26 reference case, summarized above, concerning Lumber Liquidators' "sourcing
27 initiatives" and "line reviews" by Lynch and Schlegel, and the Company's allegedly
28 false explanations of the nature of its elevated margins for the Laminates, based

upon the sale of cheaper, non-CARB Phase 2 compliant Laminates.

51.     Similar to the formaldehyde non-compliance of the Laminates (which is not the basis of any claims made in this action), Lumber Liquidators' Chinese suppliers have the capacity to manufacture AC3 laminate flooring, but it is more expensive to do so (versus manufacturing AC2, AC1, or laminates that fail even the AC1 standard, such as the Laminates). This is because the incorporation of more resilient wear layers is more expensive.

52.     Similar to the formaldehyde non-compliance of the Laminates (which is not the basis for any claims made in this action), Lumber Liquidators knew that its Laminates did not comply with AC3, or was reckless in continuing to represent AC3 compliance without independently verifying same, after negotiating discounts with its Laminates suppliers.

53.     In a "limited warranty" that Lumber Liquidators contends it extended to Plaintiff and all putative Class Members in conjunction with their purchases of the St. James, Ispiri, Kensington Manor, and Nirvana lines of Dream Home brand Laminates, Lumber Liquidators states:

> Each board is meticulously inspected throughout the manufacturing process to make sure it complies with [St James's] unwavering standards.

If these statements are true, then Lumber Liquidators must have known that the Laminates were not AC3 compliant, as extensive testing has now revealed.

54.     In its limited warranties for the Laminates, Lumber Liquidators states that the Laminates are "free of defects."

55.     Lumber Liquidators knew that its Laminates did not comply with AC3, or was reckless in continuing to represent AC3 compliance without independently verifying same after negotiating discounts with its Laminates suppliers.

## Defendant's Website and Other Misrepresentations and Omissions

56.     When researching a Laminate purchase on the Lumber Liquidators' website, an individual must visit a minimum two pages shortly before purchasing

Lumber Liquidators' product:

      a.    a laminates "landing page" ("Laminates Landing Page") describing the Company's wood laminate flooring, including the Laminates, and containing specific representations; and

      b.    a product-specific page, accessed by clicking on an image or name shown on the Laminates Landing Page, that provided more particular specification for each Laminate product.

57.    An individual would see the following representations by Lumber Liquidators on the Laminates Landing Page:

      a.    "Very durable and scratch-resistant;" or

      b.    "Very scratch-resistant."

58.    Each Laminate product-specific webpage expressly described the Laminate as having an AC rating of "AC3."

59.    Defendant's website advertised that the Laminates, including the "St. James Collection", the "Kensington Manor Collection", the "Nirvana" Collection and the "Ispiri Collection" all have an AC rating of "AC3".

60.    Defendant also represents on its website that the Nirvana Collection comes with a "25 year warranty."

61.    Defendant also represents on its website that the St. James Collection is "very durable" and comes with a "30 year warranty."

62.    Defendant also represents on its website that "Kensington Manor is a premium 12mm laminate" and lists the "Kensington Manor Flooring Advantages," which include an AC Rating of AC3 and a 30 year warranty.

63.    Defendant also represents on its website that its Ispiri Collection has certain superior qualities and ingredients, including: "With its new laminate manufacturing process called Liquid Oxide High Definition technology the Ispiri Collection has raised the bar on . . . durability." Further, Defendant's website

represents the "Ispiri Collection's Advantages" include an AC rating of AC3 and a 30 year warranty.

64.    Lumber Liquidators' store managers and staff, who are employees of Defendant, are trained by Lumber Liquidators to answer customer questions and to market the Laminates.

65.    These employees are encouraged and trained to use Lumber Liquidators product descriptions contained on Defendants' website, including the Laminate Landing Page and product-specific pages for the Laminates, to describe the Laminates' characteristics and qualities.

66.    As set forth more particularly below, these employees systematically told Plaintiff and other customers that the Laminates were "very durable," "just as durable as U.S.-made laminates," "scratch-resistant," "more durable than hardwood," "harder than hardwood," and that they "would not scratch," "wood not scratch from pet nails," and would "hold up" to pets. These representations were made to Plaintiff and to putative Class Members based upon the Laminates' claimed AC3 compliance.

67.    Defendant, and its employees, failed to disclose to Plaintiff and to each putative Class Member that the Laminates were not AC3 compliant, were not durable, were not scratch-resistant, and would not resist fading, staining, and the other problems alleged herein relating to the defect.

68.    On page 1 of its invoice provided to Plaintiff at the time of sale, Lumber Liquidators states that Kensington Manor Dream Home Laminate and St. James Collection come with a "30 year warranty." There is no reference on page one of the invoice to a "limited warranty," and no indication of any limitation to the warranty on this page.

69.    The subsequent disclaimer, appearing on page 3 of Plaintiff's invoice, is not conspicuous, is vague and does not mention the word "merchantability" as required under the Uniform Commercial Code as a requirement to disclaim the

1  implied warranty of merchantability.

2     70.    Lumber Liquidators' purported "limited warranties" were not presented

3  to or shown to Plaintiff or putative Class Members at the time of the sale.

4     71.    Any limitations in the limited warranties fail of their essential purpose,

5  or are otherwise both procedurally and substantively unconscionable, and therefore

6  ineffective.

7  **Why Lumber Liquidators Representations Are False**

8     72.    Lumber Liquidators' representations that the Laminates meet the

9  industry AC3 standard are false because the Laminates do not meet this standard.

10    73.    Lumber Liquidators' representations that the Laminates are "durable,"

11 "very durable," "very scratch-resistant," "scratch-resistant," and "harder than

12 hardwood" and the oral representations listed above and more particularly below are

13 false because the Laminates do not have these qualities, on account of the defects

14 alleged herein.

15 **Plaintiff's Discovery of the Durability Defect**

16    74.    Over the past months, a sample of Plaintiff's laminate flooring product

17 was tested by a certified and accredited laboratory. The testing method used by the

18 lab is the same standardized test method used worldwide throughout the flooring

19 industry to determine the AC rating of laminate flooring products. The laminate

20 flooring Plaintiff purchased failed to meet the AC3 rating, which was advertised by

21 Lumber Liquidators.

22    75.    Whether a product complies with the AC3 industry standard is not

23 something that would be apparent to consumers. AC3 testing is expensive and

24 requires special expertise and equipment not readily available or accessible to a

25 consumer.

26    76.    When Lumber Liquidators, through its customer service department or

27 through store sales personnel, are approached with durability issues such as

28 scratching and the other manifestations of the defect alleged herein, it engages in a

pattern and practice of delay and obfuscation.

77. Lumber Liquidators personnel did not inform Plaintiff that her durability problems, as set forth below, resulted from the failure of the Laminate to meet the claimed AC3 industry standard.

78. A common practice at Lumber Liquidators has been to blame durability problems and defects on:

      a.   Installers or installation problems;

      b.   Moisture problems;

      c.   Normal product variability; and

      d.   Product abuse.

79. Lumber Liquidators' lawyers recently attributed the detailed product defect manifestations listed in a prior related proceeding to installation failures, further continuing the pattern of denial by Lumber Liquidators and confirming their client's previous pattern.

80. By engaging in a pattern and practice of deflecting durability problems attributable to the defect alleged herein—failure to meet the claimed industry AC3 standard — or by attributing durability problems to causes other than the defect (installation, etc.), Lumber Liquidators fraudulently concealed the defect from Plaintiff and putative Class Members.

81. Plaintiff and putative Class Members cannot reasonably be charged with notice of the defect prior to the discovery of widespread supplier problems relating to Lumber Liquidators' Chinese-sourced Laminates as a result of the formaldehyde controversy in 2015.

82. Defendant sells the Dream Home line of laminate flooring products, and others, at Lumber Liquidators' 37 retail stores in California, 12 stores in North Carolina, 28 stores in Texas, 13 stores in New Jersey, 26 stores in Florida, 3 stores in Nevada,  8 stores in Connecticut, 10 stores in Georgia, 16 stores in Illinois, 3 stores in Iowa, 8 stores in Indiana, 4 stores in Kentucky, 5 stores in Louisiana, 10

stores in Massachusetts, 10 stores in Maryland, 3 stores in Maine, 10 stores in Michigan, 6 stores in Minnesota, 2 stores in Mississippi, 5 stores in Missouri, 2 stores in Nebraska, 19 stores in New York, 13 stores in Ohio, 3 stores in Oklahoma, 20 stores in Pennsylvania, 8 stores in South Carolina, 6 stores in Tennessee, 12 stores in Virginia, 7 stores in Washington, 5 stores in Wisconsin and 3 stores in West Virginia, and 5 stores in Alabama.   Lumber Liquidators also sells these laminate floor products to consumers through the internet at www.lumberliquidators.com and through telephone sales at 1-800-HARDWOOD.

83.    Plaintiff seeks to represent herself and all similarly-situated persons who have purchased Dream Home laminate flooring products from Defendant in the United States for her Third Cause of Action, as well as all similarly situated persons who have purchased Dream Home laminate flooring in Alabama for the First, Second, Fourth, and alternatively Third Causes of Action, at any time from the date the products were first placed into the marketplace through the date last sold to the public, reportedly in May 2015 (the "putative class"). Plaintiff seeks damages and equitable relief on behalf of the Class, which relief includes but is not limited to restitution to the Plaintiff and Class Members of the full amount of the purchase price and out-of-pocket expense paid to install their laminate flooring, the cost or replacing the defective flooring, injunctive relief and declaratory relief; and any additional relief that this Court determines to be necessary to provide complete relief to Plaintiff and the Class.

## PARTIES

84.    Plaintiff Doreen Masters resides in Leeds, Alabama.

85.    Defendant Lumber Liquidators, Inc. is a Delaware corporation with its headquarters and principal place of business at 3000 John Deere Road, Toano, Virginia.   Lumber Liquidators, Inc. distributes, markets, and/or sells the laminate flooring at issue and actively conducts business in Alabama.

**JURISDICTION AND VENUE**

86.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) ("CAFA"), in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of states different from the Defendant.

87.    This Court has personal jurisdiction over the parties in this action by the fact that Defendant is a corporation that is authorized to conduct business in Alabama and it has intentionally availed itself of the laws and markets of Alabama through the promotion, marketing, distribution and sale of its laminate wood flooring products.  Plaintiff purchased her laminate flooring from Lumber Liquidators in Birmingham, Alabama.

88.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Venue is also proper under 18 U.S.C. §1965(a), because Defendant transacts a substantial amount of its business in this District.

**PARTICULARIZED FACTUAL ALLEGATIONS**

89.    On or about February 13, 2015, Plaintiff Doreen Masters purchased Dream Home Kensington Manor Golden Teak 12mm and Dream Home St. James Burnet Road Russet 12mm laminate flooring from Lumber Liquidators' store # 1206 located in Birmingham, Alabama. Plaintiff Masters, her mother and her aunt all went to the Lumber Liquidators Birmingham store and were specifically told by the salesman that the Kensington Manor Golden Teak 12mm and the St. James Burnet Road Russet 12mm laminate flooring Plaintiff Masters was interested in purchasing were very scratch resistant, were the best products one can buy, and had an AC3 rating. Defendant's webpage for Kensington Manor Golden Teak represents that "Kensington Manor is a premium . . . product line" that has a "moisture resistant board." The landing page immediately before the page for the Kensington Manor

Golden Teak laminate product stated that Lumber Liquidators' laminate flooring is "very durable and scratch resistant."  Defendant's webpage also advertises that this product has an AC rating of AC3 and a 30 year warranty. Defendant also represented on its website that its St. James Collection line of laminate flooring products is "very durable" and the "St. James Collection's Advantages" include an Abrasion Class rating of "AC3" and a "30 Year Warranty." Plaintiff relied upon the above-mentioned representations in making her decision to purchase this product from Defendant.   However, soon after installation, Plaintiff noticed swelling, warping, separating and peeling of the flooring, even in places where there is no foot traffic. Plaintiff has used Defendant's product as it was intended to be used for normal residential traffic, but the flooring does not withstand normal wear and tear during normal use and has failed and deteriorated long before its advertised useful life. Plaintiff would not have purchased the Kensington Manor Golden Teak or St. James Burnet Road Russet laminate products had she known that they were defective, not durable, and had an inferior ability to withstand abrasion.

90.    At the time she purchased her flooring Plaintiff received a three-page invoice. The first page of the invoice mentioned a "30 year warranty." The third page of the invoice recited a disclaimer of implied and express warranties, but did not mention the warranty of merchantability. The third page of the invoice included a signature line but it was left blank.

## **CLASS ALLEGATIONS**

91.    This action may properly be maintained as a class action pursuant to Federal Rules of Civil Procedure Rule 23. The Class is sufficiently numerous, since it is estimated to include tens of thousands of consumers, the joinder of whom in one action is impracticable, and the disposition of whose claims in a class action will provide substantial benefits to the parties and the Court.

92.    <u>Class Definition</u>: Without prejudice to later revisions, the Class Plaintiff seeks to represent is composed of:

a.      All persons in the United States who purchased the Laminates from Defendant. This proposed class is only for Plaintiff's Third Cause of Action; and,

b.      All persons who purchased in Alabama the Laminates from Defendant. This proposed class includes Plaintiff's First, Second, and Fourth Causes of Action, and alternatively includes Plaintiff's Third Cause of Action.

93.     Excluded from the Class are governmental entities, Defendant, its affiliates and subsidiaries, Defendant's current and former employees, officers, directors, agents, representatives, their family members, and the members of the Court and its staff.

94.     Throughout discovery in this litigation, Plaintiff may find it appropriate and/or necessary to amend the definition of the Class. Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

95.     <u>Class Members Are Numerous</u>:  While Plaintiff does not know the exact number of Class Members, Plaintiff is informed and believes that there are thousands of Class Members. The precise number of members can be ascertained through discovery, which will include Defendant's sales, service and other business records. The Class is so numerous that the individual joinder of all members of the Class is impractical under the circumstances of this case.

96.     <u>Common Questions of Law and Fact Predominate</u>: There is a well-defined community of interest among the Class.  The questions of law and fact common to the Class predominate over questions that may affect individual Class Members.  These questions of law and fact include, but are not limited to, the following:

a.      Whether Defendant's laminate flooring is defective when used as intended or in a reasonably foreseeable manner;

b.    Whether Defendant's laminate flooring has an AC Rating less than AC3;

c.    Whether Defendant's laminate flooring was fit for its intended purpose;

d.    Whether Defendant has breached the implied warranty of fitness for a particular purpose;

e.    Whether Defendant has breached the implied warranty of merchantability;

f.    Whether Defendant knew that its laminate flooring was defective and had an Abrasion Class rating of less than AC3;

g.    Whether Defendant omitted and concealed material facts from its communications and advertising to Plaintiff regarding the durability of its laminate flooring;

h.    Whether Defendant falsely advertised that its laminate flooring products were "AC3" rated, "very durable" and "very scratch-resistant" when in fact they were not;

i.    Whether Defendant's misrepresentations or omissions constitute unfair or deceptive practices under the Alabama consumer protection statute alleged herein;

j.    Whether Plaintiff and proposed Class Members have been harmed and the proper measure of relief;

k.    Whether Plaintiff and proposed Class Members are entitled to an award of punitive damages, attorneys' fees and expenses against Defendant; and

l.    Whether, as a result of Defendant's misconduct, Plaintiff is entitled to equitable relief, and if so, the nature of such relief.

97.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of the proposed class. Plaintiff and all Class Members have been injured by the same wrongful practices of Defendant. Defendant made the same uniform representations on its website and on the labels affixed to their product packaging. Plaintiff is informed and believes that these representations were made by Defendant nationally and throughout Alabama, on its website, and other forms of advertisements which were identical. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of all Class Members and are based on the same legal theories.

/ / /

21602.1

22

98.. <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages they have suffered are typical of all other Class Members. Plaintiff has retained attorneys experienced in consumer class actions and complex litigation as counsel.

99. <u>Superiority</u>: The disposition of Plaintiff's and proposed Class Members' claims in a class action will provide substantial benefits to both the parties and the Court. The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because:

a. The individual amounts of damages involved, while not insubstantial, are such that individual actions or other individual remedies are impracticable and litigating individual actions would be too costly;

b. If each Class Member was required to file an individual lawsuit, the Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with vastly superior financial and legal resources;

c. The costs of individual suits could unreasonably consume the amounts that would be recovered;

d. Given the size of individual proposed Class Members' claims and the expense of litigating those claims, few, if any, proposed Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them

1            and absent proposed Class Members have no substantial interest

2            in individually controlling the prosecution of individual actions;

3     e.    This action will promote an orderly and expeditious

4            administration and adjudication of the proposed class claims,

5            economies of time, effort and resources will be fostered and

6            uniformity of decisions will be insured;

7     f.    Without a class action, proposed Class Members will continue to

8            suffer damages, and Defendant's violations of law will proceed

9            without remedy while Defendant continues to reap and retain the

10           substantial proceeds of its wrongful conduct;

11     g.    Plaintiff knows of no difficulty that will be encountered in the

12           management of this litigation that would preclude its

13           maintenance as a class action;

14     h.    Proof of a common business practice or factual pattern which

15           Plaintiff experienced is representative of that experienced by the

16           Class and will establish the right of each member of the Class to

17           recover on the causes of action alleged; and

18     i.    Individual actions would create a risk of inconsistent results and

19           would be unnecessary and duplicative of this litigation.

20    100.  Plaintiff and Class Members have all similarly suffered irreparable

21 harm and damages as a result of Defendant's unlawful and wrongful conduct.  This

22 action will provide substantial benefits to Plaintiff, the Class and the public because,

23 absent this action, Plaintiff and Class Members will continue to suffer losses,

24 thereby allowing Defendant's violations of law to proceed without remedy and

25 allowing Defendant to retain proceeds of its ill-gotten gains.

26 / / /

27 / / /

28

# FIRST CAUSE OF ACTION

## Breach of Implied Warranty

101.   Plaintiff individually and on behalf of all others similarly situated, adopts and incorporates by reference all foregoing allegations as though fully set forth herein.

102.   Defendant impliedly warranted that the Laminates were merchantable, fit for their intended purpose and suitable for general residential use, including high traffic areas.

103.   The Laminates are not merchantable. In breach of the implied warranty of merchantability, the Laminates are defective because they do not have an AC rating of AC3, prematurely fail due to scratches, impacts, warping, fading, stains and edge curling and are not suitable for general residential use.

104.   The Laminates were defective when they left Defendant's control and entered the market.

105.   The Laminates' defects were not open and/or obvious to consumers.

106.   Any purported disclaimer or limitation of the duration and scope of the implied warranty of merchantability given by Defendant is ineffective, not conspicuous, unreasonable, unconscionable and void, because Defendant knew or recklessly disregarded that the defect in the Laminates existed and might not be discovered, if at all, until the flooring had been used for a period of time, and Defendant willfully withheld information about the defect from purchasers of flooring.   Moreover, due to the unequal bargaining power between the parties, Plaintiff and the proposed Class Members had no meaningful alternative to accepting Defendant's attempted pro forma limitation of the duration of any warranties.

107.   Defendant received notice that the Laminates were not merchantable through Plaintiff's complaints to Lumber Liquidators, her correspondence, its own product testing, its "robust Quality Assurance program," numerous customer

1    complaints, and its customer service and warranty operations, and through a putative

2    class action filed in Los Angeles well before Plaintiff and proposed Class Members

3    filed suit.    Defendant has had adequate and reasonable opportunity to cure its

4    breaches but has failed to do so.

5        108.    As a result, Plaintiff and all proposed Class Members have been

6    damaged in, *inter alia,* the amount they paid to purchase and replace Defendant's

7    un-merchantable laminate flooring.

8                        **SECOND CAUSE OF ACTION**

9                            **Fraudulent Concealment**

10        109.    Plaintiff individually and on behalf of all others similarly situated,

11    adopts and incorporates by reference all foregoing allegations as though fully set

12    forth herein.

13        110.    Defendant represented on its website that its Nirvana line of laminate

14    flooring products have an Abrasion Class rating of AC3 and a "25 year warranty."

15    Defendant also represented on its website that its St. James Collection line of

16    laminate flooring products is "very durable" and the "St. James Collection's

17    Advantages" include an Abrasion Class rating of "AC3" and a "30 Year Warranty."

18    Defendant also represented that its Kensington Manor Collection line of laminate

19    flooring products is a "premium 12 mm" laminate product line and that the

20    "Kensington Manor Collection Advantages" include an AC rating of AC3 and a "30

21    Year Warranty." Defendant also represented on its website that its Ispiri Collection

22    line of laminate flooring "has raised the bar on . . . durability." Defendant's website

23    also represents the "Ispiri Collection's Advantages" include an AC rating of AC3

24    and a 30 Year Warranty. Further, the product packaging of all of Defendant's Dream

25    Home brand of laminate flooring states it comes with a "30 Year Warranty."

26        111.    Plaintiff is informed and believes that Lumber Liquidators knew, or

27    recklessly disregarded that the Laminates were defective based upon hundreds of

28    complaints posted by Lumber Liquidators' customers on websites, including but not

1    limited      to,      www.ths.gardenweb.com,      www.consumeraffairs.com,

2    www.complaintlist.com, www.my3cents.com and others, which describe scratching,

3    bubbling, delaminating, peeling and curling of Lumber Liquidators' Dream Home

4    laminate flooring identical to the damages suffered by Plaintiff herein.

5       112.   For example, on June 1, 2005, "kitchenlover" posted the following

6    question on www.ths.gardenweb.com:

7         "Anyone used the Dream Home laminate from LL?"

8       113.   On or about September 14, 2005 "pat111153" responded to the above-

9    referenced    question    by    posting    the    following,    in    relevant    part,    on

10    www.ths.gardenweb.com:

11       "…chips show up on edges later…."

12       114.   On or about January 25, 2007, "sammyswife" posted the following

13    another response on www.ths.gardenweb.com:

14       "I HATE this flooring!! Does anyone have the Dream Home parent company
info? LL is no help! The salesman incorrectly told us how to install it. After a year
15    of it being down, we are ripping it up because it looks horrible! It chips and peels
and is awful! LL blames our installation, but thanks to their own people, we cannot
16    get anywhere with the so-called warranty. I want to write the company directly and
can't seem to find them anywhere. If anyone knows a link or number of where I can
17    call, please email me at [redacted for privacy], thanks!"

18       115.   On or about June 12, 2011 "grandpe02" posted his/her response on

19    www.ths.gardenweb.com:

20       "I recently perchased (*sic*) 1000sq ft. of dream home French oak. Big
mistake. LL was no help at all. The boards were very warped and chipped after
21    laying. And it can't be cleaned without leaving streaks. And seems LL they have
never heard this from anyone before. Wish I would have checked out the internet
22    first. This stuff is garbage…"

23       116.   On or about April 11, 2013, "poorchoice" posted his response on

24    www.ths.gardenweb.com as follows:

25       "Finished laying Dream Home Nirvana Plus on Saturday. Job went well and
Wife was pleased. Floor was beautiful with tight joints and a warm rich color.
26    While replacing furniture, Wife dragged a plant with a plastic saucer under it and
made some scratches across the middle of the room. Scratches are not too bad, but
27    raised suspicions. I moved the recliner, which has plastic pads on it to find that in
just 4 days the laminate is worn through the 'warm rich color'. Wife says the
28    salesman said that this stuff wont scratch with anything but a knife. LL warrants it

for foot traffic for 25 years, so I guess you are supposed to keep it covered except where you walk.  I have some question about its longevity since the recliner wore through to white in 4 days…."

117.   On or about November 4, 2013, "KDraper" posted his response as follows on www.ths.gardenweb.com:

"We had this product professionally installed. HATE it. Six months after it was put in we started seeing areas delaminate. Some were high traffic some were low/no traffic…We contacted the company through LL.  Their answer was we our area was either too wet or too dry and it wasn't their problem that we had almost 1000sf of this flooring that looked like crap.  I will never use LL again…."

On www.complaintslist.com "Pat" wrote on April 23, 2013:

"When we went there, we were met by the store manager, 'Dave' (He was very sick at the time, remember!) and informed him we were looking for a floor that would not scratch as we had two small dogs. Dave showed us some flooring samples and said to us, 'it will not scratch from your dogs, I have a dog and the same flooring in my house and mine has no scratches.'  Well not more than two weeks after it was installed, we noticed scratches on the floor."

118.   On www.mythreecents.com, "AllenB" wrote on November 23, 2009:

"Spent almost 10,000 dollars on a prefinished floor by Lumber Liquidators. After only a week of normal use I notices serious scratching.  I took closer notice and marked over 100 scratches on these floors, many all the way through the finish! Three salesman we spoke to before buying this product all answered the same questions we asked, 'Will our dogs or children scratch this floor with their normal use?'  They assured me we would have no problem, explained how these floors are ideal with pets and even gave us promotional material that showed a large dog on this floor."

119.   On www.mythreecents.com, "JR in Arizona" wrote on March 20, 2010:

"In 2007 I bought the Asian Birch Flooring. Within 6 months it started to delaminate. It is engineered wood flooring. I finally made a complaint to LL asking for repairs where the floor is clearly separating from the wood backing…After a week they sent me a letter saying they were not responsible. I guess they get to rewrite their warranties as they please."

120.   In response to this complaint, Lumber Liquidators posted the following response on March 29. 2010, proving it was monitoring customer complaints on this website:

"If we had someone take photos of the flooring it would have been in support of your warranty as a need to hold a manufacturer accountable for quality should a defect be found.  Flooring will react to changing conditions and we not the invoice, warranty and installation instructions, as well as some boxes also note requirements for maintaining ideal conditions.  The problem is most consumers don't read this information until a problem occurs…a little too late, then expect LL to compensate for issues out of our control…In some situations we even send a complimentary box

to help with repairs, but it sounds like the problem was not with the flooring, but rather some installation or site condition…I'm sorry to hear this lead to some dissatisfaction as the problem would be the same no matter where you shopped; you would most likely pay more elsewhere.  Read the information provided _ Dan Gordon often provides some good advice as well with his replies – Bob Villa also knows how important it is to read the installation instructions/warranty."

121.   On www.consumeraffairs.com, Lana of Trabuco Canyon, CA wrote on August 6, 2015:

"Warranty claim unresolved due to company unresponsiveness spanning 8 months. We noticed some surface chipping away on a little area in the formal living room that we rarely use. It had been only 2.5 years from purchasing the engineered wood with a 30 year warranty. We initiated the warranty process with the worst encounters of customer service that I have experienced. For the last 8 months we have experienced months of delays, avoidance, ignored, and being forwarded to multiple customer service representatives. Matt, representative of Lumber Liquidators stated that it was impossible that it was Lumber Liquidator's faulty wood and that it was the installers fault just by looking at the pictures.

I researched online regarding warranty claims of customers of Lumber Liquidators and that it is their reasoning to other customers regarding warranty claims. Note this is prior to any inspection that Matt came to the conclusion. Rather insulting when myself and fiancé had to deal with 8 months of delays, avoidance, being ignored, and being forwarded to multiple customer service representatives just to have him state that via e-mail. We're taking them to small claims court but, I just want potential customers or customers their actual warranty practices and poor customer service because Lumber Liquidators advertises warranty and customer service as their key points to why customers go to them."

122.   On www.consumeraffairs.com Will of Sandia Park, NM wrote on June 10, 2015:

"We purchased America's Mission Olive 12mm laminate flooring from Lumber Liquidators in December of 2014 and had it installed throughout our home (except bathrooms) in our new remodel. We chose this floor after speaking with their sales people who convinced us that this is a very durable floor, which would hold up great to pets and kids. We had the floors installed by a professional and were very happy with the results for about a month. That was when we started noticing the chips all over the floor and the bubbling along the edges of the planks. If a drop of liquid came into contact with these floors, even if wiped up immediately, the surface of the product would start to peel away from the backing. And anytime anything was dropped on the floor they would chip.

We were extremely disappointed because these floors had been sold to us as being extremely durable and multiple employees at the Albuquerque store told us that they would be great for a family with pets and kids. We contacted their customer care line, sure that they would make this right since this was obviously a misrepresentation of the product they were selling. We figured that a company this large would have some pride in their products and stand behind what they sold. Unfortunately this has not been the case at all.

After jumping through hoops we were told to send them a box of our unopened flooring. We did this and a few days later we contacted with an "it's not our fault" letter. They said that they had done internal testing and that based off of the pictures we had sent them and their "internal testing" it was moisture damage. The funny thing is that we didn't even send pictures of the bubbling from moisture, we had just send pictures of the chipping. This showed us that they hadn't even bothered to review our claims before writing us off!!

After this, we requested to see the report on our floors from their "internal tests" and were told "there is no report, just a notation made on the file that the issues of concern are not manufacturing related. I don't know what the inspection process is except for what I have already shared with you as this is done by a separate entity." ARE YOU KIDDING ME?? What reputable, ethical company runs "internal testing" and doesn't document it? At this point we were very frustrated with the company because it is obvious that they have been giving us the runaround. So after many more emails and calls (most of which were never even acknowledged) we were told they would send out a "third party inspector". The inspector finally came and took some pictures and moisture readings and left without giving us any information.

We were contact by Lumber Liquidators a few days later with another not saying it is all moisture related and not their fault. However, their own warranty states that "Your Ispiri floor is warranted against finish wear from normal household conditions resulting in exposure of the paper layer". This is exactly what is happening in our home! We have since asked multiple times to see a copy of the report be the "third party inspector" and have been ignored. We have also requested multiple times to speak with a supervisor, only to be ignored each time.

I would never recommend Lumber Liquidators to anyone. In fact, I will be doing just the opposite. For the amount of money we spent it would be nice if they would stand behind their product and make sure their customers were satisfied and that they were selling good quality product, but unfortunately this is not the case at all."

123.. Plaintiff is informed and believes that Lumber Liquidators' website advertising its Dream Home brand of laminate flooring products includes a video testimonial which features a family with two dogs and two cats, and the Lumber Liquidators' salesman shown on that video claims, "Kensington Manor has a high, high durability factor. That's something people are looking for when they have animals." The screen shot of the video depicting a large dog appears on every webpage for the Dream Home line of laminate flooring products, implying that these products are durable enough to withstand scratches from pet traffic.

124. Defendant concealed and suppressed material facts concerning the durability of its Dream Home laminate flooring products. Defendant failed to disclose that its Dream Home laminate flooring products were defective, not AC3

1  rated, not "very durable", were not "premium" and would scratch, fade, stain,
2  bubble, delaminate and curl during ordinary residential foot and pet traffic. As
3  alleged above, the Laminates were defective, were of a lesser quality than advertised
4  and had an inferior ability to withstand abrasion than advertised.  These facts were
5  not known to Plaintiff and the proposed Class at the time of their purchase.  These
6  omitted and concealed facts were material because they directly impact the useful
7  life and durability of the products.

8      125.   Alternatively, Defendant intentionally failed to disclose the fact that the
9  Laminates were defective in that they were not fit for their intended use, a fact only
10 known to Defendant. Plaintiff and the proposed Class could not have discovered it
11 through the exercise of reasonable diligence. Plaintiff is informed and thereon
12 believes that Defendant knew of the durability defects of the Laminates from its
13 product testing and Defendant's self-proclaimed "robust Quality Assurance
14 program" performed prior to placing the laminate flooring products into the stream
15 of commerce.

16     126.  Plaintiff and the proposed Class reasonably relied on Defendant's
17 representations. Defendant knew or ought to have known that Plaintiff and the
18 proposed Class relied and/or would have reasonably relied upon Defendant to sell
19 laminate wood flooring products in which the entire lifetime of the goods could be
20 fully used without prematurely becoming damaged and/or failing. Defendant's
21 knowledge that its laminate flooring products were not fit for their intended use,
22 combined with Defendant's knowledge that Plaintiff and the proposed Class relied
23 upon Defendant to communicate the true durability, or lack thereof, of its laminate
24 flooring products creates a legal obligation on Defendant's part to disclose to
25 Plaintiff and the Class these facts. Defendant is in a superior position to know the
26 truth about, and the nature of, the durability and useful life of its laminate flooring
27 products.

28 / / /

127.   Defendant intended to deceive Plaintiff and the Class by failing to disclose that it's laminate flooring products are not fit for their intended purpose, will fail prematurely long before the end of the 25 and 30 year warranty periods, were not "very durable" and do not have the AC3 rating.

128.   Defendant's failure to disclose these facts was material. Plaintiff and the proposed Class would not have purchased their laminate flooring had they known that their laminate flooring products were not fit for their intended use, would prematurely fail long before the end of the 25 and 30 year warranty periods, were not "very durable" and did not have an AC rating of AC3.

129.   Plaintiff and the proposed Class were harmed. As a proximate result of Defendant's conduct as set forth in this cause of action, Plaintiff and the proposed Class will now be required to remove and replace their defective and damaged laminate flooring.

130.   Defendant's concealment was a substantial factor in causing that harm.

131.   The wrongful conduct of Defendant, as alleged herein, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious, and/or in conscious disregard for the wellbeing of Plaintiff and the proposed Class. Defendant intended to cause injury to the Plaintiff and the proposed Class placing profits over providing a higher quality product which was advertised to Plaintiff. Defendant engaged and continues to engage in despicable conduct with a willful and conscious disregard of the rights or safety of others. Defendant subjected, and continues to subject, Plaintiff and the proposed Class to cruel and unjust hardship. Accordingly, Plaintiff and the proposed Class members are entitled to an award of punitive damages against Defendant in an amount to deter it from similar conduct in the future.

/ / /

/ / /

/ / /

**THIRD CAUSE OF ACTION**

**Violation of The Magnuson-Moss Warranty Act**
**15 U.S.C. §§ 2301, et seq.**

**(On behalf of the National Class, or alternatively, the Alabama Class)**

132.   Plaintiff, individually and on behalf of all others similarly situated, adopts and incorporates by reference all foregoing allegations as though fully set forth herein.

133.   Plaintiff brings this claim on behalf of herself and on behalf of each and every member of the proposed Class.

134.   Plaintiff and the other members of the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

135.   Lumber Liquidators is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4)-(5).

136.   Lumber Liquidators' Dream Home proprietary line of laminate flooring products was purchased separate and apart from the initial construction of the homes of the Plaintiff and the members of the proposed Class into which it was installed and constitutes a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

137.   Pursuant to section 2308(a) of the Magnuson-Moss Warranty Act, "No supplier may disclaim or modify . . . any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, . . ."

138.   Furthermore, section 2308(c) provides that "A disclaimer, modification, or limitation made in violation of this section shall be ineffective for purposes of this chapter and State law."

139.   Lumber Liquidators' express warranties and written affirmations of fact regarding the durability and level of performance over time of the Laminates constitutes a written warranty within the meaning of 15 U.S.C. § 2301(6)(A).

1    140.   Lumber Liquidators breached its warranties (express and implied) by
2    manufacturing, selling, and/or distributing the Laminates that are not "very durable",
3    not "scratch resistant," which fail prematurely long before the expiration of the
4    stated warranty duration, and have an Abrasion Class rating below "AC3", without
5    knowledge of the truth of such representations.

6    141.   Defendant further violated 15 U.S.C. §2302 by failing to make a full
7    and conspicuous disclosure of the terms and conditions of the 25 and 30 year
8    warranties advertised on Defendant's website and on page 1 of the Invoice in the
9    product description of Laminates sold to Plaintiff and the Members of the proposed
10   Class.

11   142.   Lumber Liquidators breached its warranties to Plaintiff and the
12   members of the proposed Class because these written affirmations of fact or written
13   promises made in connection with the sale of the Laminates relate to the nature of
14   the material and affirms or promises that such material will meet a specified level of
15   performance over a specified period of time and in fact fail to do so.  15 U.S.C.
16   § 2301(6)(A).

17   143.   Lumber Liquidators' breach deprived Plaintiff and the members of the
18   proposed Class of the benefit of their bargain.

19   144.   The amount in controversy of Plaintiff's individual claim exceeds the
20   value of $25.  In addition, the amount in controversy exceeds the value of $50,000
21   (exclusive of interest and costs) computed on the basis of all claims to be
22   determined in this action.

23   145.   Before filing this action, Plaintiff notified Defendant of its breach of
24   written warranties and of its violations of the Magnuson-Moss Warranty Act, and
25   Defendant has failed to adequately cure those breaches.  Additionally, Defendant
26   was notified of its breaches, *inter alia,* though a putative class action filed in Los
27   Angeles, California. Defendant has had adequate and reasonable opportunity to cure
28   its breaches of or fulfill its warranty obligations, but has failed to do so.

146.   Pursuant to the provisions of 15 U.S.C. § 2310(e), in the case of a class action (as is the case here), Plaintiff will provide Defendant with further notice and reasonable opportunity to cure, once the representative capacity of the named Plaintiff has been established in the application of Rule 23 of the Federal Rules of Civil Procedure.

147.   As a direct and proximate result of Defendant's breaches of its written and implied warranties, Plaintiff and the other members of the proposed Class sustained damages in amounts to be determined at trial.

### FOURTH CAUSE OF ACTION

**Violation Of The Alabama Deceptive Trade Practices Act**

**Alabama Code § 8-19-1, *et seq*.**

148.   Plaintiff Doreen Masters, individually and on behalf of all others similarly situated, adopts and incorporates by reference all foregoing allegations as though fully set forth herein.

149.   Defendant's actions and/or omissions as described herein violated the Alabama Deceptive Trade Practices Act, Alabama Code § 8-19-1, *et seq*. ("the ADTPA"), which was enacted to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising in the conduct of any business, trade or commerce.

150.   The ADTPA, Alabama Code § 8-19-5, provides, in pertinent part, as follows:

**Unlawful trade practices.**

The following deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful:

(2) Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

(3) Causing confusion or misunderstanding as to the affiliation, connection, or association with, or certification by another, provided that this section shall not prohibit the private labeling of goods or services.

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(21) Intentionally misrepresenting that a warranty or guarantee confers or involves certain rights or remedies.

151.   Specifically, Defendant knowingly misrepresented and intentionally omitted material information regarding its Dream Home laminate flooring by representing in its advertisement that its flooring had an Abrasion Rating of AC3 when it does not.

152.   Defendant's misrepresentations and concealment of material facts concerning the Laminate's Abrasion Rating constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or the knowing concealment, suppression or omission in connection with the sale and use of Defendant's Dream Home laminate flooring in violation of Alabama Code § 8-19-1, *et seq*.

153.   Defendant violated Alabama Code § 8-19-1, *et seq*., by knowingly and falsely representing in its advertisement that its Dream Home laminate flooring had an Abrasion Rating of AC3 and was fit to be used for the purpose for which it was intended, when Defendant knew or was reckless in not knowing that it was defective, unreliable, and had a lower Abrasion Rating and by other acts alleged herein.

154.   Alabama has enacted statutes to protect consumers from deceptive, fraudulent, and unconscionable trade and business practices such as those alleged in this Complaint.

155.   As a direct and proximate result of Defendant's violation of Alabama Code § 8-19-1, *et seq*., Plaintiff and the Class Members are entitled to compensatory

1  damages, equitable and declaratory relief, punitive damages, costs and reasonable

2  attorneys' fees.

3  **PRAYER FOR RELIEF**

4  WHEREFORE, Plaintiff, on behalf of herself and all other individuals

5  similarly situated, requests the following relief:

6  A. An order certifying this action as a class action under F.R.C.P. 23,

7  defining the Class as requested herein, appointing the undersigned as

8  Class counsel, and finding that Plaintiff is a proper representative of the

9  proposed Class;

10  B. Injunctive relief requiring Defendant to inform Plaintiff and members

11  of the proposed Class that:

12  • Lumber Liquidators has not effectively disclaimed the implied

13  warranty of merchantability, and that the Laminates continue to

14  be subject to such implied warranties;

15  • the warranty limitations contained in Defendant's "limited

16  warranties" are unenforceable;

17  • Plaintiff and proposed Class members are entitled to restitution,

18  including reimbursement for any installation, removal, and

19  replacement costs; and that

20  • Plaintiff and proposed Class members may be entitled to other

21  relief as awarded by this Court;

22  C. Restitution of all monies Defendant received from Plaintiff and the

23  proposed Class;

24  D. Damages to be determined at trial including actual, compensatory, and

25  consequential damages incurred by Plaintiff and proposed Class

26  Members;

27  E. Punitive damages where allowed;

28  F. An award of reasonable attorney's fees and costs; and

1      G. That the Court award such other and further relief as this Court may

2    deem appropriate.

3  DATED: August 31, 2016          ROBERTSON & ASSOCIATES. LLP

4                                       */ s / Alexander Robertson, IV*

       By: ───────────────────────────

5                                       Alexander Robertson, IV (CA SBN 127042)
                                        Mark J. Uyeno  (CA SBN 189063)

6

7                                       WHITFIELD BRYSON & MASON, LLP
                                        Daniel K. Bryson (*Pro Hac Vice* Pending)
                                        Patrick Wallace (*Pro Hac Vice* Pending)

8

9                                       AHDOOT & WOLFSON, PC
                                        Robert Ahdoot (CA SBN 172098)
                                        Tina Wolfson (CA SBN 174806)

10

11                                     **Attorneys for Plaintiff and The Proposed Class**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28